2020 IL App (2d) 170986-U
No. 2-17-0986
Order filed May 29, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of DeKalb County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 17-CF-14 |
| | ) | |
| MICHAEL TUNE, | ) | Honorable |
| | ) | Robin J. Stuckert, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUDSON delivered the judgment of the court.
Presiding Justice Birkett and Justice Bridges concurred in the judgment.

**ORDER**

¶ 1    *Held*: Evidence was sufficient to prove defendant's guilt beyond a reasonable doubt; failure to qualify police officer as expert before he gave expert testimony was harmless; admission of other-crimes evidence was neither error, plain error nor ineffective assistance of counsel.

¶ 2                                    I. INTRODUCTION

¶ 3    Defendant, Michael Tune, was convicted of one count of unlawful possession of a controlled substance following a jury trial in the circuit court of DeKalb County (he was also convicted of simple possession, which merged into the other count of which he was convicted). He now appeals. For the reasons that follow, we affirm.

¶ 4                                        II. BACKGROUND

¶ 5     On January 7, 2017, defendant was arrested in the entryway of an apartment building (the Gideon Court Apartments) where he had come to meet with an undercover police officer. The police recovered 0.3 grams of cocaine from defendant. They also recovered 5.29 grams of cocaine from Marcella Jasso, who had driven defendant to the apartment complex and was waiting in a parked car.

¶ 6     Defendant was charged with four counts based on this incident. Count 1 charged defendant with possessing with intent to deliver more than 1 gram but less than 15 grams of cocaine within 1000 feet of a school. Count 2 charged defendant with possessing with intent to deliver more than 5 grams but less than 15 grams of cocaine. The third count alleged that defendant possessed "any amount of a substance containing cocaine." Count 4 charged possession of any amount of cocaine with intent to deliver. Defendant was convicted of the latter two counts, but acquitted of the former two.

¶ 7     Prior to trial, defendant moved to suppress a statement he made following his arrest. At the suppression hearing, Sergeant Jeff Weese, of the DeKalb Police Department testified that he participated in defendant's arrest on January 7, 2017. Defendant had an outstanding warrant. He searched defendant and found a small plastic baggy stuck to defendant's sweaty forehead containing a white substance that appeared to be cocaine. Defendant was transported to the DeKalb police station and interrogated. Weese read defendant his *Miranda* rights, and defendant initialed next to each right and signed the bottom of the form. Weese signed as a witness. Weese asked defendant why he was at the Gideon Court Apartments. Defendant stated that he was there to sell cocaine. Defendant told Weese that the cocaine belonged to the person out in the car. She had driven him there and asked defendant to sell the cocaine to a guy in the apartment. Defendant

stated that he had never met the buyer before. On cross-examination, Weese stated that he did not believe defendant was given *Miranda* warnings at the scene of the arrest. Weese acknowledged that he had asked defendant what was in the baggy he recovered while still at the scene. Defendant's interrogation was not recorded, though recording equipment was available. Weese agreed that defendant was in custody. While still at the scene of the arrest, defendant asked about working for the police. Weese stated that he did not initiate that conversation. Weese was unsure whether that subject was discussed further at the police station, though he felt it likely was. He did not mention it in his police report because it is "very, very sensitive information." Such information is typically excluded from police reports.

¶ 8    Defendant then testified that when the officers first arrested him, they did not *Mirandize* him, but nevertheless questioned him about why he was at the apartment building. They also asked about who was calling on defendant's phone. He was transported to the police station and placed in an interview room. After 45 minutes to an hour, Weese came in. They discussed "that he might be able to get [defendant] out of [there] tonight if [he] cooperated with them and signed a contract but before [they] could go any further with that [defendant] had to sign [a] *Miranda* waiver." Defendant then signed the waiver form. Weese then told defendant he had to admit that he was at the apartment complex to sell the cocaine the police recovered from defendant. Another officer asked defendant to sign a waiver for a search of his cell phone. Defendant was told that the police could not help him unless he cooperated completely. Defendant told Weese he would only accept responsibility for the drugs that were on him, and Weese told defendant he had to accept responsibility for all of the drugs. Weese then terminated the interrogation. Weese returned and told defendant he had to take responsibility for everything. Defendant then admitted that he was at the apartment complex to sell cocaine to a person he had never met before, but the cocaine did

not belong to him, rather, it belonged to Jasso (the female in the car waiting outside). It was his understanding that the charges would be reduced if he "completed some kind of contract" that Weese was talking about.

¶ 9    Weese testified in rebuttal. He stated he made no promises to defendant that he would be able to help defendant if defendant cooperated. However, he acknowledged discussing with defendant the possibility of defendant being a confidential informant.

¶ 10    Defendant argued that his waiver of his *Miranda* rights was not voluntary because it was made in contemplation of an offer of leniency for working for the police. The trial court rejected this argument and found that defendant knowingly and intelligently waived his rights.

¶ 11    A jury trial commenced on September 12, 2017. During its opening statement, the State informed the jury that the investigation of defendant began on December 30, 2016, when officers received information that defendant was selling drugs in the DeKalb area. The prosecutor also told the jury that defendant was arrested pursuant to an open warrant. No objection was interposed at either point.

¶ 12    The first witness to testify for the State was Detective Sonny Streit. Streit testified that he had been a police officer for over six years. He attended the police academy and has had "subsequent training in drugs, narcotics, sales; things of that nature." On January 7, 2017, he was assigned to the targeted response unit, which focusses on "narcotics, weapons, street gangs, parolees[,] and sex offenders." In December 2016, Streit testified, he received information from another detective that defendant was "selling cocaine in DeKalb." Defense counsel objected to this testimony as hearsay, and the State responded that it was not being offered for the truth of the matter. The trial court overruled the objection.

¶ 13    Streit found defendant's telephone number on defendant's Facebook page.  He sent a message to defendant's number, asking, "Do you got that girl?"  The actual message read, "U got that grl."  Streit explained that "girl" is slang for cocaine.  No objection was made to this testimony.  Streit added, "It's a slang term that we use for [sic] people we've arrested in the past, things that we've seen on Facebook and other social media websites and urban dictionary."  Defendant replied, "Who is this, but yes" (the actual message read "Whi is this" and "But yeah").  These messages were sent on December 31, 2016.  Streit stated that he would text in incomplete sentences "to sound younger and not sound like a police officer."

¶ 14    On January 5, 2017, Streit texted defendant, "U good?"  He intended this to mean, "Do you have what I was looking for earlier."  Defendant responded, "Who is this."  Streit texted, "Jake" and then "Gt ur num at stanlys last week nd sum girl."  Subsequently, defendant asked, "R the one talkin tattoos and shit with me."   Two days later (January 7 at about 9:30 p.m.), Streit answered, "ya."  Streit then said, "Stil nd if u gud" and "My girl is askin bout wht u would chrge for a tat party."  Defendant texted, "We can do both."  Streit asked if they could do the party in a couple of weeks and if a Friday would be acceptable.  Defendant responded affirmatively, and Streit stated he would let defendant know after Streit spoke with his girlfriend.

¶ 15    Streit testified that they then set up the transaction.  Streit stated he wanted to pick up the drugs tonight.  He told defendant he was looking for a ride, and defendant stated he could come to Streit.  Streit told defendant he could meet him, but he could not leave his apartment.  Defendant asked Streit how much money he was going to spend, and Streit told him $50.  Defendant called Streit when he arrived at the apartment complex.  Streit said he would come down to the lobby.  Other officers identified and arrested defendant.  Streit explained, "We knew we had an active warrant, criminal arrest warrant for his arrest."  No objection was made to this testimony.  After

the other officers confronted defendant, Streit arrived and called the telephone number that he had been using to contact defendant. A phone in defendant's possession rung. Defendant gave permission to search the phone at the police station, and a series of texts corresponding to those sent from Streit's phone was discovered.

¶ 16   Streit approached the car that had transported defendant to the apartment complex and made contact with Marcella Jasso. She handed Streit several bags that she had removed from the pocket of her jacket. They contained a white powder. Streit testified that when he attempts to make a drug transaction, neither he nor the person he is dealing with typically refers to the drug at issue by its name.

¶ 17   On cross-examination, Streit agreed that it was important "to be accurate and include all details" in a police report. However, he acknowledged that his report does not state that "girl" is slang for cocaine. The following colloquy then took place:

"Q. You testified that you received information Mr. Tune was selling cocaine in DeKalb. Do you have any specific instances when he was selling cocaine in DeKalb?

A. That information was provided by Detective Erickson and Sergeant Weese.

Q. Did they provide you any specific instances of Mr. Tune selling cocaine?

A. Just the information provided by the cooperating subjects.

Q. You don't know who these subjects are?

A. I do.

Q. Did you speak with these subjects?

A. One of them, yes.

Q. Did that subject provide you information specifically about cocaine deals, sales of cocaine from Mr. Tune?

A. Yes."

Streit agreed that this information did not appear in his report. Streit testified that all of the cocaine except for the one packet found on defendant's forehead was recovered from Jasso's person.

¶ 18    The State then called Marcella Jasso. In the early evening hours of January 7, 2017, Jasso gave defendant a ride to Elgin. They went to a McDonald's and then returned to DeKalb. On the way back, defendant told Jasso that he had gone to Elgin to pick up cocaine. She dropped defendant off at his home. Jasso lived nearby. A little later, a friend called and asked if she would drive defendant to Malta. Jasso agreed and picked up defendant. She was supposed to drive him to a gas station. On the way, defendant asked to stop by the Gideon Court Apartments. She did so. Defendant handed Jasso several bags and said, "Here, if anything happens, *** take care of this." Defendant went inside. When asked whether defendant told her what he was doing at the apartment complex, Jasso stated, "No, I don't—actually I think he did tell me he had to go make a deal." Jasso drove to the end of the parking lot, turned around, and returned to pick up defendant. A police officer approached her car. She removed the cocaine defendant had given her from her pocket and gave it to the officer.

¶ 19    Jasso testified that she made a deal with the State. As part of the deal, she is required to testify truthfully. She was originally charged with possession with intent to deliver, which is a class one felony. Pursuant to the deal, she is pleading guilty to simple possession, a class four felony.

¶ 20    Jasso testified that she was arrested and transported to the police station. She gave the police a small baggie of cocaine that had been in her bra. Defendant had given it to her as payment for the ride. Jasso stated that she had forgotten about it earlier.

¶ 21    On cross-examination, Jasso stated that she had never met defendant before January 7, 2017.  She was familiar with where he lived from dropping other people off there.  She acknowledged that the cocaine in her bra was for her personal use.  She admitted to using cocaine, but stated that she was not a heavy user.  Defendant also gave her $10 for gas on the way to Elgin.  Jasso agreed that the deal she made with the State would result in her not having a criminal record if she complied with it.

¶ 22    The State's final witness was Jeff Weese, a sergeant with the DeKalb Police Department.  In January 2017, he was part of the targeted response unit, which focused mainly on narcotics.  At about 9:24 p.m., he was in the parking lot  at the Gideon Court Apartments.  Other officers had arranged to have an individual (defendant) deliver cocaine to that location.  Weese determined that there was an outstanding warrant for defendant's arrest (no objection was interposed to this testimony).  Shortly after they arrived, defendant was observed entering the vestibule of one of the apartment buildings.  They made contact with defendant, arrested him, and placed him in handcuffs.  Defendant's phone rang, and Weese took possession of it.  He recognized the number that was calling the phone as coming from a phone that Streit was using.  Defendant was searched and a baggie of cocaine was discovered stuck to his sweaty forehead.  Weese then assisted in the search of the car Jasso was driving.  Defendant was transported to the police station.

¶ 23    At the station, Weese read defendant his *Miranda* rights.  Defendant signed a waiver form.  Defendant then told Weese that he had gotten a ride from a girl to the Gideon Court Apartments.  He was there to sell cocaine to a man he had never met before.  All of the cocaine belonged to Jasso.

¶ 24    On cross-examination, Weese acknowledged that less than one gram of cocaine was recovered from defendant while over five grams were recovered from Jasso.  No fingerprints or

DNA linked defendant to the cocaine recovered from Jasso. At one point, defense counsel asked, "Now, you testified that [defendant] was delivering cocaine in DeKalb; is that correct?" Counsel then went on to ask whether Weese was aware of any specific such instances. Weese replied that he was not.

¶ 25    On redirect-examination, Weese testified that it was not common practice to test drugs for fingerprints or DNA. Further, it was not unusual to receive a tip that did not contain a lot of specific information. On recross-examination, Weese acknowledged that they had, "once or twice" tested drugs for fingerprints or DNA in a "drug-induced homicide." The State then rested.

¶ 26    Defendant testified in his own behalf. He acknowledged that he is a convicted felon. He has been convicted of theft, retail theft, and possession of a stolen motor vehicle. These convictions occurred between 4 and 10 years ago. He recalled the exchange of texts between him and Streit. Defendant stated that Streit had identified himself as a college student defendant had met the week before at a bar. They were speaking about tattoos. Defendant stated that almost all the messages reference tattoos. Defendant has been tattooing for 10 years and has worked at a tattoo shop in Elgin. He also did house calls. Defendant noted that not one of the text messages mentioned cocaine. No cost or quantity is mentioned.

¶ 27    Defendant stated that while he did not know anyone named Jake, he met college students all the time, and the person texting him had stated they had met the weekend before. A tattoo party is when a group of usually five or more people get together and defendant tattoos all night. Usually, he would receive a $100 deposit.

¶ 28    At about 7 p.m. on January 7, 2017, Jasso came to pick up defendant. A mutual friend had arranged for her to drive defendant to pick up his wallet from someone in Elgin. Jasso's daughter was in the car as well. She was about 10 years old. They drove to a McDonald's in Elgin, and

defendant went inside for 5 to 10 minutes. Defendant bought Jasso's daughter something to eat. On the way back, defendant asked Jasso "if there was anybody I could purchase anything [from]." She replied, "Absolutely." Defendant was going to Rochelle. A friend asked Jasso if she could bring defendant halfway, and Jasso agreed. Jasso picked up defendant about 9 p.m. Defendant got a text message and asked to stop at the Gideon Court Apartments. Defendant explained that he was not sure what the text message was referencing and that Streit's messages were confusing. He stated that Streit had called defendant "a couple times and he wanted to get a tattoo that night and by the time we got back from Elgin it just took too long." Therefore, defendant went to the Gideon Court Apartments "to try to make an appointment with him." Defendant went inside and was arrested. He admitted that he had cocaine in his possession and testified that he had gotten it from Jasso. Defendant did not know about the other cocaine Jasso had in her possession.

¶ 29    Defendant testified that after he was arrested, Weese told him that he could work as a confidential informant and that Weese could help him out. Weese told defendant that to do so, defendant would have to admit that he was at the Gideon Court Apartments to sell drugs. At the police station, defendant told Weese he would have to use his phone so he could respond to people. He explained to Weese that if he did not, people might think he was in custody, and this would impair his ability to work with the police. Defendant was told he would have to wait.

¶ 30    Weese told defendant that they had to discuss "what was going on like at that moment" before they could discuss defendant working as a confidential informant. Weese asked defendant to admit that the cocaine they recovered from Jasso was actually his. Defendant declined to do so. Defendant did admit that he was at the Gideon Court Apartments to sell drugs because Weese told him he had to before Weese could help him. Defendant added that he was not actually at the

apartment complex to deliver the cocaine that was in his possession. After defendant refused to accept responsibility for the cocaine recovered from Jasso, Weese said that they were done.

¶ 31    On cross-examination, defendant stated that when he told Streit they could do both, he was referring to a tattoo for Streit and a tattoo party later. Further, when Streit asked defendant if he was good, defendant thought he was asking whether defendant was good at tattooing. Defendant also thought Streit was talking about getting a tattoo when he asked, "any chance I can grab tonight." Defendant further asserted that when he replied that he was "trying to get a ride to go get it," the word "it" referred to his tattoo equipment. Defendant acknowledged that though he was coerced to admit he was at Gideon Court to sell drugs, he never admitted the drugs recovered from Jasso were his despite Weese wanting him to admit that they were.

¶ 32    On redirect-examination, defendant clarified that he did not actually know what the ambiguous texts he was receiving referred to. He did not believe they were discussing cocaine. Defendant was not familiar with the policies of the DeKalb police regarding confidential informants. He never admitted the cocaine recovered from Jasso belonged to him.

¶ 33    The State then called Weese in rebuttal. When defendant was first arrested, he brought up the topic of working for the police. Defendant stated that he had to leave so no one would see him with the police. Weese told defendant they had to go to the police station first. Weese never told defendant that he had to take responsibility for the cocaine recovered that night before he could work as a confidential informant. Weese did not document these discussions in his police report because the information was sensitive and police reports could be obtained by the public in certain circumstances. Weese acknowledged that when defendant raised the subject of working for the police at the police station, Weese told him they had to first address defendant's *Miranda* warnings

and "do an interview about this specific incident." Weese never threatened defendant or told him he had to admit to anything. Ultimately, defendant never worked as a confidential informant.

¶ 34   Defendant was convicted of possession of cocaine and possession of cocaine with intent to deliver (which merged) and sentenced to 8 1/2 years' imprisonment. Defense counsel did not file a posttrial motion for a new trial. This appeal followed.

¶ 35                                    III. ANALYSIS

¶ 36   On appeal, defendant first challenges the sufficiency of the evidence on which his conviction is based. He further argues that he was denied a fair trial because: (1) Streit was allowed to testify as a lay witness while relying on his specialized knowledge and training; (2) evidence that the police had learned defendant was dealing drugs in DeKalb should not have been allowed; and (3) evidence that defendant was arrested on an unrelated warrant should not have been permitted.

¶ 37                        A. SUFFICIENCY OF THE EVIDENCE

¶ 38   The due process clause requires that a criminal conviction rest on proof beyond a reasonable doubt of every fact necessary to constitute the charged offense. *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004). When a defendant asserts that the evidence does not support a criminal conviction, a reviewing court, viewing the evidence in the light most favorable to the State, must ascertain whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Id*. The factfinder's decision to accept a witness's testimony is entitled to great deference and may be rejected only if the evidence compels a conclusion that no reasonable person could agree with the factfinder's decision. *Id.* at 280. A criminal conviction will not be set aside unless the evidence is so unsatisfactory as to raise a reasonable doubt regarding the defendant's

guilt. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). Keeping these standards in mind, we conclude that the evidence against defendant was overwhelming.

¶ 39 Most importantly, defendant confessed. While defendant contends that it was coerced, several considerations undermine this claim. First, Weese testified positively and credibly that he never threatened defendant or told him that he had to take responsibility for the cocaine recovered that night before he could work as a confidential informant. It is true that defendant offered contradictory testimony on this point; however, he fails to establish that no reasonable person could accept Weese's testimony over his. As such, we must defer to the factfinder here. *Id*. Further, we note that defendant did not admit that the cocaine recovered from Jasso was his despite his claim that Weese wanted him to admit to this as well. That defendant's will was not overborn on this point provides a reasonable basis for the trier of fact to reject his claim that his will was generally overborn. See *People v. Kincaid*, 87 Ill. 2d 107, 120 (1981) ("Additionally, it seems extremely unlikely that, had the defendant's will been overborne, he would have been able, first, to deny any wrongdoing with the alleged victim, then to admit, in a very limited way, any wrongdoing."). Furthermore, we note that the interrogation was not particularly long and defendant signed a *Miranda* waiver, both factors that militate in favor of deeming a statement voluntary. See *People v. Phillips*, 2018 IL App (3d) 130270, ¶ 46 (*Miranda* waiver); *People v. Lash*, 252 Ill. App. 3d 239, 246 (1993) (duration of interrogation).

¶ 40 Second, the trier of fact could have reasonably believed Streit's testimony that the exchange of texts between him and defendant documented a drug transaction over defendant's claim that he believed they were negotiating a tattooing party or session. Streit initiated contact with defendant by texting "U got that grl," explaining that "girl" is slang for cocaine. Thus, this was consistent with a drug transaction; it is not apparent how it would be consistent with setting

up a tattoo session. Later, Streit asked via text, "U good?" By this, Streit was inquiring if defendant had available what Streit had inquired about earlier. He reiterated, ""Still nd if u gud" and also told defendant that his girlfriend was interested in setting up a tattoo party in a few weeks. Defendant replied that they could do both, from which it is inferable that he is referring to the subsequent tattoo party and what Streit was asking for that day. When asked if he could get it tonight, defendant stated he was "trying to get a ride to go get it." At trial, defendant claimed that by "it," he was referring to his tattoo equipment. However, this is inconsistent with his testimony that he was simply going to meet with Streit to set up an appointment for later and hopefully get Streit to give him a deposit. Moreover, when defendant did get to the Gideon Court Apartments, he did not have his tattoo equipment with him, but he did have cocaine in his possession. In other words, there were ample bases for the jury to prefer Streit's testimony to defendant's attempted explanation.

¶ 41 We also note that Jasso's testimony implicated defendant. She described driving defendant to Elgin. Defendant told her they had gone there to pick up cocaine. Later that day, she was giving defendant a ride to Malta. On the way, defendant asked to stop at Gideon Court. He handed her several bags containing cocaine and went inside. When asked whether defendant told her what he was doing at the apartment complex, Jasso stated, "No, I don't—actually I think he did tell me he had to go make a deal." Defendant claims that the jury rejected Jasso's testimony because it did not find him guilty of either count involving the cocaine recovered from Jasso. Counts 1 and 2 alleged possession with intent to deliver more than a gram of cocaine, which would have required the jury to have determined that defendant possessed the cocaine recovered from Jasso. However, the jury could have based its findings on the intent element. Since, on Jasso's testimony, defendant left this amount in the car when he went to make the deal, the jury could have had a reasonable

doubt as to defendant's intent to deliver that portion of the cocaine. The third count charged defendant with possession of any amount of cocaine, so it is unclear whether the jury found that defendant possessed only the cocaine recovered directly from him or the cocaine recovered from Jasso as well. Either scenario would be consistent with a conviction on count 3. The conviction on count 4 would be consistent with finding intent only with respect to the cocaine defendant actually brought to the transaction. Thus, the record does not conclusively establish that the jury rejected Jasso's testimony. As we must construe the record in the light most favorable to the State (*Cunningham*, 212 Ill. 2d at 278), we must give it credit here. Defendant provides us with no compelling reason for us to conclude that the trier of fact should have rejected Jasso's testimony. The mere fact that she made a deal with the State for her testimony is insufficient. See *People v. Campbell*, 275 Ill. App. 3d 993, 998 (1995).

¶ 42    Defendant notes that many of the classical indicia of intent are lacking in this case, such as: "1) the quantity of the controlled substance when it is too large to be viewed as being for personal consumption; 2) the high degree of purity of drugs; 3) the possession of weapons; 4) the possession of large amounts of cash; 5) the possession of police scanners, beepers, or cellular telephones; 6) the possession of drug paraphernalia; and 7) the manner in which the drugs are packaged." See *People v. Robinson*, 167 Ill. 2d 397, 408 (1995). Defendant points out that outside of the fact that he possessed a cell phone (admittedly not a particularly compelling fact in this day and age), none of these factors are present. However, such circumstantial evidence loses considerable probative value where direct evidence exists, such as defendant's confession. We do not regard the absence of such evidence as significant here.

¶ 43    In short, we find the evidence more than ample to support defendant's conviction.

¶ 44                              B. ALLEGED TRIAL ERRORS

¶ 45    Defendant next complains of three alleged errors during his trial.  First, he contends that Streit was allowed to testify based on his specialized knowledge despite never being qualified as an expert.  Second, defendant complains of the State introducing evidence that the police had heard defendant was dealing drugs in the DeKalb area.  Third, he argues that it was error to allow testimony that he was arrested on an open warrant.  The admission of evidence is a matter lying within the discretion of the trial court.  *People v. Becker*, 239 Ill. 2d 215, 234 (2010).  Accordingly, we will only disturb these decisions if the trial court abused its discretion, that is, if no reasonable person could agree with the trial court.  *Id.*

¶ 46    Defendant acknowledged that, since no posttrial motion was filed, none of these errors are properly preserved and asks that we review them as plain error.  The plain-error doctrine permits a court of review to address an error that has not been properly preserved in certain circumstances.  *People v. Herron*, 215 Ill. 2d 167, 178 (2005).  Review is permitted where the evidence is so closely balanced that the guilty verdict may have resulted from the error rather than the evidence.  *Id.*  As explained above, the evidence in this case was overwhelming, so the first prong does not apply.  Alternately, it is allowed "where the error is so serious that the defendant was denied a substantial right, and thus a fair trial."  *Id.* at 179.  The first step in determining whether plain-error occurred is to ascertain whether any error occurred in the first place.  *People v. Lewis*, 234 Ill. 2d 32, 43 (2009).  We thus turn to defendant's arguments.

¶ 47                                    1. Streit's Alleged Opinion Testimony

¶ 48    Defendant complains that Streit was permitted to testify as to the meaning of  various texts exchanged between him and defendant.  Specifically, he argues that Streit's testimony that "girl" meant cocaine was based on Streit's specialized knowledge.  Further, defendant complains of Streit's testimony that "U good?" and "Stil nd if u gud?" were inquiries as to whether defendant

had cocaine available to sell. Defendant also points to Streit's interpretation of "Ne chance I cn grb 2nite?" as a request to buy cocaine that evening. Streit was not offered as an expert by the State.

¶ 49    Defendant points out that lay testimony is limited to opinions and inferences that are "not based on scientific, technical, or other specialized knowledge." Ill. R. Evid. 701 (eff. Jan. 1, 2011). According to defendant, Streit's understanding of drug jargon constitutes such specialized knowledge and is therefore beyond the scope of lay testimony.

¶ 50    Defendant's argument is untenable in light of the supreme court's decision in *People v. Grant*, 2013 IL 112734. There, the court considered a police officer's testimony that "dro" was slang for high-grade marijuana. *Id.* ¶ 13. It noted that the defendant did not object to this testimony and added: "This is not surprising. Courts in other jurisdictions allow such testimony by police officers." It then cited approvingly *State v. Mason*, 2004—Ohio—4896, ¶¶ 25-28, where "the court held there was no error in allowing a police detective to testify regarding the meaning of the term '40,' which meant ' "$40 worth of crack cocaine." ' " Defendant suggests that *Grant* is distinguishable in that it involved a probable cause determination and the issue of whether the officer's testimony was improper was not actually before the court. Assuming this statement is dictum, it clearly is of the judicial sort (see *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 236 (2010)), as it is extensively discussed and supported by citation to several authorities. Accordingly, it provides guidance here. Thus, in accordance with *Grant*, Streit's testimony was not improper.

¶ 51    Additionally, the First District addressed a highly-analogous situation in *People v. Loggins*, 2019 IL App (1st) 160482. There, a police officer opined as to "the uses of plastic bags, blenders, and inositol in the drug trade." *Id.* ¶ 76. As here, no objection was interposed. In the course of

resolving the case, the court observed, "[I]f the officer formed an opinion as to the meaning of the code words by relying on his or her experience in drug investigations more broadly, it is an expert opinion." *Id.* ¶ 91. It continued, "In other words, it is an expert opinion if the officer knows, from investigating *other* transactions or conspiracies, that certain words, while seemingly innocuous to the untrained ear, generally bear hidden meanings when they are used in certain situations." (Emphasis in original.) *Id.* The court determined that the opinions offered by the officer constituted expert testimony and the officer should have been qualified as an expert before the testimony was allowed. *Id.* ¶ 98.

¶ 52   The *Loggins* court went on to find that the error was harmless. It observed, "When testimony is improperly admitted as a lay opinion, the error is harmless if the witness was, in fact, qualified as an expert, and thus would have been accepted as an expert by the trial court if so tendered." *Id.* ¶ 110. It then noted that the officer rendering the opinions had 5 years of experience as a narcotics investigator and had been a police officer for 12 years. *Id.* ¶ 111. He had completed a course at the police academy in narcotics investigation and had participated in annual field training. *Id.* The *Loggins* court found that had the officer been tendered as an expert, the trial court would have accepted him. Such is the case here. Streit testified that he majored in law enforcement at Western Illinois University and then attended the police academy in Champaign. He passed a number of tests to become a police officer, and he underwent subsequent training in drugs, delivery, sales and "things of that nature." He was assigned to a unit that focused "on primarily narcotics, weapons, street gangs, parolees and sex offenders." While Streit's training and experiences do not appear to be as extensive as the officer testifying in *Loggins*, they are nonetheless substantial, and we perceive no reasonable possibility that the trial court would not have accepted him as an expert on the subject of drug transactions. "In Illinois, generally, an

individual will be permitted to testify as an expert if his experience and qualifications afford him knowledge which is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion." *People v. Enis*, 139 Ill. 2d 264, 288 (1990); see also Ill. R. Evid. 702 (eff. Jan. 1, 2011). Surely, the experience and education described by Streit "afford him knowledge which is not common to lay persons." *Id*. Moreover, to the extent the record is not more developed on this subject, it is likely due to defendant's failure to interpose a timely objection.

¶ 53    Defendant also argues that even if Streit possessed the expertise to opine on the meaning of the terms he used in conversing with defendant via text, Streit had no way of knowing what defendant understood those terms to mean. State of mind is generally proved by circumstantial evidence. *People v. Casler*, 2019 IL App (5th) 160035, ¶ 28. Here, defendant's understanding of those terms can be inferred from his confession, the fact that he showed up at the designated meeting place while possessing cocaine, and Jasso's testimony as well as Streit's testimony about the meaning of the texts. That is, defendant's behavior confirms Streit's testimony as to the meaning of the exchange of text messages. Streit's testimony was but one part of a larger picture.

¶ 54    Alternatively, defendant asserts that some of what Streit interpreted for the jury was actually common language that did not need interpretation. See *United States v. Dukagjini*, 326 F.3d 45, 50 (2d Cir. 2003); *United States v. Cruz*, 363 F.3d 187, 193-94 (2d Cir. 2004) (holding that it was error to allow police officer to interpret the phrase "watch one's back" to mean act as lookout in a drug transaction). Defendant asserts, "[I]t was improper, under the Second Circuit's admissibility guidelines, for Streit to offer his opinion that Tune was agreeing to a drug transaction when he sent various texts to Streit such as, 'You still need that,' and 'Were you at how much money.' " We fail to see how defendant was prejudiced by this. As noted in the preceding paragraph, Streit's testimony was but one part of a body of evidence from which the meaning of

these phrases could be inferred, and they, in turn, are a part of the evidence of defendant's intent, relative to his confession and behavior. Further, some portions of the messages (such as that "girl" meant "cocaine") clearly involved drug jargon.

¶ 55    In short, in light of *Grant* we hold that no error occurred, and, in light of *Loggins*, even if it did, it was harmless.

¶ 56                    2. Evidence That Defendant Was A Drug Dealer

¶ 57    Defendant next argues that the State should not have been allowed to argue and present testimony that the investigation of defendant began when the police received information the he was dealing drugs in the DeKalb area. The subject first arose during the State's opening argument, when the prosecutor stated, that the investigation of defendant began on December 30, 2016, when officers received information that defendant was selling drugs in the DeKalb area. The State elicited testimony of this nature from Streit. Defense counsel objected on hearsay grounds, and the trial court overruled the objection when the State responded that it was not being offered for the truth of the matter asserted. Defense counsel then elicited more detailed testimony during cross-examination of Weese, specifically that the police were unaware of any specific incidences of prior drug dealing by defendant.

¶ 58    Defendant agrees, generally, that course-of-investigation testimony constitutes an exception to the hearsay rule. *People v. Rush*, 401 Ill. App. 3d 1, 15 (2010). However, he asserts, such testimony must be limited to that which is necessary to explain the actions of the police. *People v. Edgecombe*, 317 Ill. App. 3d 615, 627 (2000). Defendant then contends, "Under the course-of-investigation exception, DeKalb officers could have testified that they spoke with someone at the Sheriff's Office and then decided to investigate Michael Tune." Obviously, the jury was aware that the investigation involved drug dealing. In essence, defendant is arguing that

while it would have been proper to tell the jury "we received information and based on that information we decided to investigate defendant for drug dealing" but improper to relay to the jury that "we received information that defendant was dealing drugs and based on that information we decided to investigate defendant for drug dealing." We fail to see how the "information" referenced in the former statement can be construed as referring to anything other than drug activity. There is barely a distinction here. Given the equivalence between the two statements, we cannot say that no reasonable person could agree with the trial court that this statement was admissible.

¶ 59    Moreover, without referencing specific acts of drug dealing, we fail to see how making explicit in the latter statement what is implicit in the former resulted in any prejudice to defendant. Indeed, defense counsel cross-examined Weese and effectively established that there was only a general allegation and no specific incidents of drug dealing at issue. Prejudice is an essential component of a claim such as this. See *People v. Pikes*, 2013 IL 115171, ¶ 23. Moreover, harmless error cannot rise to the level of plain error. *People v. Leach*, 2012 IL 111534, ¶ 141. Here, while the better practice may have been to present this information in the manner advocated by defendant, we are unconvinced that this resulted in any meaningful prejudice to defendant or had an impact on the outcome of the trial.

¶ 60    We find the two cases defendant primarily relies on distinguishable. In *People v. Shorty*, 403 Ill. App. 3d 625 (2010) (vacated on other grounds by *People v. Shorty*, 239 Ill. 2d 582 (2011)), the defendant was on trial for possessing heroin. In its opening statement, the State informed the jury that a confidential informant told a police officer that the defendant was going to Chicago to buy heroin later that evening. Over objection, the trial court allowed a witness to testify that the defendant " 'was supposed to be making a trip to Chicago to pick up a large quantity of heroin.' "

*Id.* at 627. In *Shorty*, the information at issue was much more detailed that what was presented in the instant case and placed information before the jury that it otherwise would not have heard. Conversely, here, what was presented to the jury (that the police received some sort of information that defendant was involved in drug dealing) was readily inferable from what defendant concedes would have been proper (that the police receive information and this caused them to undertake an investigation of defendant for dealing drugs). Put differently, unlike this case, in *Shorty* additional information was placed before the jury.

¶ 61    Defendant also relies on *People v. Jura*, 352 Ill. App. 3d 1080 (2004); however, that case is similarly distinguishable. The hearsay statement in that case was the substance of a police radio call, which contained a physical description of the defendant. *Id.* at 1087. No comparable additional information was conveyed to the jury in this case.

¶ 62    Defendant briefly contends that this information constituted impermissible other-crimes evidence. See *People v. Lewis*, 165 Ill. 2d 305, 346 (1995). Analyzing this issue would require a balancing of the evidence's probative value and prejudicial effect. *People v. Illgen*, 145 Ill. 2d 353, 365 (1991). Clearly, the evidence has some probative value in explaining the course of the investigation. Further, as explained above, its prejudicial effect is minimal. As such, we do not find this argument persuasive. To conclude, we find neither error nor prejudice.

¶ 63            3. Evidence That Defendant Was Arrested On An Open Warrant

¶ 64    Defendant further asserts that it was error to introduce testimony that he was taken into custody on an open criminal warrant when he was arrested at the Gideon Court Apartments. This subject was addressed by the State during its opening argument and in the testimony of both Streit and Weese. Defendant asserts that these references to a warrant "equated to prejudicial other crimes evidence and was unnecessary for the jury's understanding of the case." Defendant

correctly notes that "evidence that suggests or implies that the defendant has engaged in prior criminal activity/other-crimes evidence should not be admitted unless somehow relevant." See *Lewis*, 165 Ill. 2d at 346.

¶ 65    The State counters that this evidence was relevant to explain the circumstances of defendant's arrest. Indeed, explaining the circumstances of an arrest is an exception to the hearsay rule. See *People v. Tolbert*, 323 Ill. App. 3d 793, 796-97 (2001). Defendant points out that the propriety of defendant's arrest was not before the jury and the State could have simply informed the jury that defendant had been arrested without mentioning the reason for the arrest.

¶ 66    The State relies on *People v. Fauntleroy*, 224 Ill. App. 3d 140, 148 (1991), where the court flatly held, "Reference to another crime during [the presentation of evidence concerning the police's investigation] is admissible if it explains the circumstances surrounding a defendant's arrest." Defendant points to *People v. McCray*, 273 Ill. App. 3d 396, 401 (1995), which holds that there is no general exception for the circumstances of an arrest and that the exception applies only if the circumstances are relevant to something at issue in the case. We have no quarrel with these legal principles.

¶ 67    The question before us then becomes, in light of the standard of review, whether no reasonable person could agree with the trial court that the circumstances of the arrest were in some way relevant to this case. It seems to us that the jury may have found the circumstances of defendant's arrest problematic in a way relevant to this case. There were intimations of overzealousness by the police and prosecution throughout the trial. In his opening statement, defense counsel informed the jury that Jasso had received a "sweet deal" to testify against defendant. Defense counsel also questioned why the police did not record defendant's interrogation. Moreover, at trial, defendant testified to how the police allegedly pressured him into

confessing by telling him he could work as a confidential informant. In light of such considerations, a reasonable person could conclude that the jury might look suspiciously on the police arresting defendant immediately upon making contact with him rather than first searching him and ascertaining whether he had cocaine on his person. This could be taken as evidence that the police had made a foregone conclusion that defendant was guilty. As a reasonable person could draw these inferences, it cannot be said that no reasonable person could agree that this evidence was relevant. As such, no error occurred here.

¶ 68                                          4. Waiver

¶ 69    Finally, even if we were to agree with defendant regarding any of these purported errors, we could not conclude that plain error occurred. As we have already noted, the evidence was overwhelming, so it was not closely balanced. Regarding the second prong of the plain-error inquiry, we also could not conclude that any of the alleged errors were "so serious that the defendant was denied a substantial right, and thus a fair trial." *Herron*, 215 Ill. 2d at 179. We fail to see how the failure to qualify Streit as an expert witness when he clearly could have been could constitute the sort of fundamental error that could have deprived defendant of a fair trial. *Cf. People v. McNeal*, 405 Ill. App. 3d 647, 673 (2010) (holding admission of expert testimony without proper foundation did not rise to the level of plain error).

¶ 70    Defendant's other two claims of error involve intimations that defendant was involved in other crimes. The improper admission of other-crimes evidence can arise to the level necessary to invoke the second prong of the plain error doctrine. See *People v. Jackson*, 2017 IL App (1st) 142879, ¶ 70. However, it does not necessarily constitute an error of this magnitude. It has been held that the failure to give a limiting instruction concerning the use of other-crimes evidence does not necessarily rise to the level of plain error. *People v. Tolbert*, 323 Ill. App. 3d 793, 800 (2001);

*People v. Hooker*, 253 Ill. App. 3d 1081, 1085 (1993). In other words, that a defendant is subject to this sort of prejudice is not necessarily second-prong plain error. This is the same sort of prejudice a defendant would experience from the erroneous admission of such evidence in the first place. Hence, all such error is not automatically plain error. Defendant does not explain why these errors in the context of this case were so fundamental as to deprive him of a fair trial. More importantly, we reiterate that we found that neither of these claims of error were well-founded, and without error, there can be no plain error.

¶ 71    We also reject defendant's claim that his trial attorney was ineffective for failing to interpose appropriate objections to these alleged errors and to preserve them for appellate review. To establish he received ineffective assistance of counsel, defendant would have to show that his counsel's performance fell below an objective level of reasonableness and that the was prejudiced by this lapse. *People v. Hodges*, 234 Ill. 2d 1, 17 (2009). Either prong may be addressed first. See *People v. Lacy*, 407 Ill. App. 3d 442, 457 (2011). As explained above, any objection to Streit's opinion would have been futile, as Streit would have been qualified as an expert had defendant objected. The failure to raise a futile objection does not constitute ineffective assistance of counsel. *People v. Massey*, 2019 IL App (1st) 162407, ¶ 34. We have determined that defendant suffered no prejudice regarding his second argument, so he could not satisfy the second prong of the ineffectiveness test. *Hodges*, 234 Ill. 2d at 17. Finally, we have determined that the evidence at issue in defendant's third argument was relevant, so any objection there would have been futile as well. Moreover, in light of the overwhelming nature of the evidence, we do not see how the vague references to other crimes that form the basis of defendant's latter two arguments could lead us to conclude that the trial would have likely come to a different result. See *People v. Peeples*, 205 Ill. 2d 480, 513 (2002) (holding that to establish prejudice, a defendant must show a reasonable

probability that the outcome of the proceeding would have been different). Accordingly, defendant's ineffectiveness argument must fail.

¶ 72                                    IV. CONCLUSION

¶ 73    In light of the foregoing, the judgment of the circuit court of DeKalb County is affirmed.

¶ 74    Affirmed.